**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, P.O. Box 14596 Washington, DC 20044, | |
| Plaintiff, | Case No. |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, 245 Murray Lane, SW Mail Stop 0485 Washington, DC 20528, | |
| Defendant. | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1. Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking records from the U.S. Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE") in response to CREW's February 13, 2026 FOIA requests relating to the administration's tracking and surveillance of protesters.

2. Since President Trump began his second term, his administration has worked to expand immigration enforcement operations while reducing oversight of DHS. Through the "One Big Beautiful Bill Act," his administration secured a massive funding increase for DHS and its components, allowing them to hire personnel, invest in new technologies, and increase the scope and intensity of their enforcement activities across the country.

1

3.      DHS's enforcement methods have been the subject of widespread and serious criticism. The American people have exercised their First Amendment rights in response to DHS's actions by voicing their opposition, organizing countless protests across the country, and by creating networks to monitor DHS's activities.

4.      Americans criticizing and protesting against the administration's policies increasingly face harassment and intimidation by DHS agents. Many have reported that DHS agents photographed their faces or license plates.[1] Others have reported that while following DHS agents, the agents led them to their own homes.[2] Still others have said that DHS agents told them their information would be stored in a "database" and that they would be labeled "domestic terrorists."[3]

5.      Through its FOIA requests, CREW intends to shed light on DHS's efforts to surveil and punish protesters and the administration's critics, allowing the American people to hold the agency accountable through their elected representatives.

6.      This Court should grant declaratory relief that DHS and its components are in violation of FOIA, and injunctive relief requiring DHS and its components to preserve all records potentially responsive to CREW's request, grant expedited processing for CREW's request, expediently process CREW's requests, and promptly disclose the requested records.

---

[1] Kat Lonsdorf, Jude Joffe-Block & Meg Anderson, *ICE Has Spun a Massive Surveillance Web. We Talked to People Caught in It*, NPR (Mar. 5, 2026), https://perma.cc/Z4DL-74UV.

[2] *Id*.

[3] Jude Joffe-Block, *A New Lawsuit Alleges DHS Illegally Tracked and Intimidated Observers*, NPR (Feb. 23, 2026), https://perma.cc/T3A8-EM4L.

**JURISDICTION AND VENUE**

7.      This Court has subject matter and personal jurisdiction over this action pursuant to 5 U.S.C. §§ 552(a)(4)(B), 552(a)(6)(C)(i), and 552(a)(6)(E)(iii). The Court also has jurisdiction under 28 U.S.C. §§ 1331, 2201(a), and 2202.

8.      Venue lies in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(b).

**PARTIES**

9.      Plaintiff CREW is a non-profit, non-partisan organization organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to protecting the rights of citizens to be informed about the activities of government officials and agencies and to ensuring the integrity of government officials and agencies. CREW seeks to empower citizens to have an influential voice in government decisions and in the government decision-making process through the dissemination of information about public officials and their actions. To advance its mission, CREW uses a combination of research, litigation, and advocacy. As part of those efforts, CREW uses government records made available to it under FOIA and widely disseminates those records to the public.

10.     Defendant DHS and its components are agencies within the meaning of 5 U.S.C. § 552(f)(1). Defendant has possession and control of the requested records and is responsible for fulfilling CREW's FOIA request.

**STATUTORY BACKGROUND**

11.     FOIA, 5 U.S.C. § 552, requires federal agencies to release requested records to the public unless one or more specific statutory exemptions apply.

12.     An agency must respond to a party making a FOIA request within 20 working days of receipt of the request, notifying the requester of the agency's determination of which of

3

the requested records it will release, which it will withhold and why, and the requester's right to appeal the determination to the agency head. 5 U.S.C. § 552(a)(6)(A)(i).

13.    An agency's failure to make this determination within 20 days is subject to judicial review without exhausting administrative remedies. 5 U.S.C. § 552(a)(6)(C)(i). In "unusual circumstances," an agency may extend the time to respond to a request by no more than 10 working days provided that the agency gives the requestor written notice setting forth the unusual circumstances and the date on which the agency expects to make a determination. 5 U.S.C. § 552(a)(6)(B)(i)-(iii); *accord* 6 C.F.R. § 5.5(c).

14.    Moreover, FOIA provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).

15.    After a FOIA request is received by an agency, it must "make reasonable efforts to search for the records." 5 U.S.C. § 552(a)(3)(C). If the agency identifies any responsive records, the agency must make them "promptly available." *Id*. § 552(a)(3)(A).

16.    Further, agencies shall grant requesters' requests for expedited processing of their FOIA requests when they demonstrate a "compelling need," as well as "in other cases determined by the agency." 5 U.S.C. § 552(a)(6)(E)(i). Demonstrating a "compelling need" requires requesters to show that they are "primarily engaged in disseminating information" with an "urgency to inform the public concerning actual or alleged Federal Government activity." *Id*. § 552(a)(6)(E)(v)(II).

17.    DHS's FOIA regulations require expedited processing when a DHS component determines that a request involves "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person who is primarily engaged in disseminating

information," or "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(ii) and (iv).

18.    FOIA requires agencies to determine whether to provide expedited processing, and to provide notice of the determination to the requester, within 10 days after the date of the request.  5 U.S.C. § 552(a)(6)(E)(ii)(I). DHS regulations mirror this requirement. *See* 6 C.F.R. § 5.5(e)(4).

19.    Agency action to deny a request for expedited processing, and failure by an agency to respond in a timely manner to such a request, is subject to judicial review. 5 U.S.C. § 552(a)(6)(E)(iii).

### FACTUAL BACKGROUND

20.    During President Trump's campaign for reelection, he promised that he would lead "the largest domestic deportation program in American history."[4]

21.    Only a few months into his second term, President Trump made good on his promise. He signed the "One Big Beautiful Bill Act" into law on July 4, 2025, allocating $165 billion in funding for DHS and its components, including ICE.[5] DHS announced that the funding would allow it to hire 10,000 additional ICE agents, invest $3.2 billion in new technology, and deport up to 1,000,000 people per year.[6]

---

[4] ProPublica & Tex. Tribune, *A Year in Trump's Mass Deportation Campaign*, at 00:04-00:10 (YouTube, Jan. 28, 2026), https://youtu.be/YHunuGIvvf4?si=jkSw5JeieasPrpiI&t=4.

[5] Press Release, DHS, *Secretary Noem Commends President Trump and One Big Beautiful Bill Signing into Law: Historic Win for the American People and the Rule of Law* (July 4, 2025), https://perma.cc/J8QT-FZT4.

[6] *Id*.

22.      DHS's methods—using unmarked vehicles,[7] obscuring agents' faces with masks,[8] warrantless arrests,[9] entering homes without judicial warrants,[10] engaging in racial profiling,[11] and using increased force[12]—drew considerable public backlash.

23.      Protests sprang up around the country[13] and private citizens created networks to observe ICE agents and report their movements.[14]

24.      Tensions escalated when DHS launched "Operation Metro Surge," which it called "the largest DHS operation ever."[15] Between December 1, 2025 and February 13, 2025, DHS sent 3,000 federal agents to Minnesota, where they made 4,000 arrests.[16]

---

[7] Chiara Eisner, *Trump Administration Relying on Unmarked Vehicles in Immigration Enforcement*, NPR (Oct. 28, 2025), https://perma.cc/UD4C-MF4L.

[8] Suzanne Monyak, *Judge Rebukes Masked ICE Arrests as 'Secret-Policing' Regime (1)*, Bloomberg Law (Feb. 20, 2026) https://news.bloomberglaw.com/us-law-week/us-judge-rebukes-masked-ice-arrests-as-secret-policing-regime.

[9] Mark Rivera et al., *Warrantless Arrests by ICE in Chicago Area Ruled Unlawful by Federal Judge*, ABC7 Eyewitness News (Oct. 8, 2025), https://perma.cc/5K3F-XLRJ.

[10] Laura Strickler & Phil Helsel, *ICE Says Its Officers Can Forcibly Enter Homes During Immigration Operations Without Judicial Warrants: 2025 Memo*, NBC News (Jan. 21, 2026), https://perma.cc/RTX3-6ESV.

[11] Jazmine Ulloa, *Can ICE Stop People Solely Based on Their Race?*, N.Y. Times (Oct. 24, 2025), https://www.nytimes.com/2025/10/24/us/ice-race-ethnicity-immigration.html.

[12] Eric Bazail-Eimil, *ICE Officials Knew Use of Force Was Rising Well Before Minneapolis Shootings*, Politico (Feb. 17, 2026), https://www.politico.com/news/2026/02/17/ice-officials-use-of-force-00782501.

[13] Jim Vertuno, *PHOTOS: Protests Against Immigration Raids Spread Across the U.S.*, PBS (Jun. 11, 2025), https://perma.cc/64CU-ZXY5.

[14] *See, e.g.*, Chip Mitchell, *Standing up to ICE in the Suburbs, the People's Patrol Puts Its Faith in Resistance*, WBEZChicago (Sept 29, 2025), https://www.wbez.org/immigration/2025/09/29/standing-up-to-ice-in-suburban-chicago-the-peoples-patrol-puts-its-faith-in-resistance.

[15] Homeland Security (@DHSgov), X (Jan. 6, 2026, at 4:21 PM ET), https://perma.cc/2W8J-2D25.

[16] Alyssa Chen, *The End of Operation Metro Surge, in Data*, Minn. Reformer (Feb. 23, 2026), https://minnesotareformer.com/2026/02/23/the-end-of-operation-metro-surge-in-data/.

25.     The operation brought life in many parts of the state to a standstill, causing businesses to suffer and school attendance to drop as people either stayed in their homes or took to the street in protest.[17] Many participated in networks to monitor and report on DHS agents' activities.[18]

26.     DHS agents responded by intimidating, harassing, and even assaulting observers. In sworn statements, observers on the ground during Operation Metro Surge described how DHS agents photographed their faces or license plates, led them to their own homes, or showed up at places they frequented.[19] They alleged that DHS agents threatened them verbally or with firearms, peppersprayed them at close range, and subjected them to unlawful arrests.[20]

27.     One such clash led to the death of Renee Good on January 7, 2026. Ms. Good's wife explained that the two had stopped to support their neighbors in an interaction with DHS when the encounter turned violent.[21] DHS agents shot into Ms. Good's car, killing her.

---

[17] Nick Lentz, *Minneapolis Faces $203M "in Impact" from Operation Metro Surge, City Leaders Say*, CBS News (Feb. 13, 2026), https://perma.cc/LWF2-XRAK; James Walsh, *School Leaders Fear Declining Attendance During ICE Surge Will Also Lower State Funding*, Minn. Star Trib. (Feb. 9, 2026), https://www.startribune.com/school-leaders-fear-declining-attendance-during-ice-surge-will-also-lower-state-funding/601576192.

[18] Tim Sullivan, *Minneapolis Community Defies ICE to Warn Immigrants of Approaching Agents*, PBS News (Jan. 29, 2026), https://perma.cc/2TXK-TP46.

[19] 1st Am. Compl. at 31-59, *Tincher v. Noem*, No. 25-cv-04669-KMM-DTS (D. Minn. Feb. 13, 2026) (citing dozens of declarations of Minnesotan protesters and observers about their interactions with DHS agents).

[20] *Id.*

[21] Casey Tolan, Rob Kuznia & Isabelle Chapman, *New Documents Shed Light on Renee Good's Ties to ICE Monitoring Efforts in Minneapolis*, CNN (Jan. 14, 2026), https://www.cnn.com/2026/01/13/us/renee-good-minneapolis-ice-monitoring-school-invs.

28.     DHS Secretary Kristi Noem called Ms. Good's actions "an act of domestic terrorism."[22] She asserted that DHS agents were acting in self-defense.[23] DHS Assistant Secretary Tricia McLaughlin echoed Secretary Noem's words and called Ms. Good a "violent rioter[]" who "weaponized her vehicle, attempting to run over our law enforcement officers."[24] Video evidence contradicted these statements, indicating that Ms. Good was attempting to drive away when she was shot.[25]

29.     In late mid-January, reports began surfacing that DHS agents were using facial recognition software and other technology to collect information about protesters.[26] In an interview with Fox News, "border czar" Tom Homan seemed to corroborate these accounts when he said that he was pushing to create a "database" to make protesters "famous" in their neighborhoods, workplaces, and schools.[27] A leaked memo instructing DHS agents to collect

---

[22] PBS NewsHour, *WATCH LIVE: Noem Holds News Conference in Minneapolis After Fatal ICE Shooting of Woman*, at 00:47-01:22 (YouTube, Jan. 7, 2026), https://www.youtube.com/live/Y3t6tS78edg?si=BFiKhJJIx6LYRzwZ&t=47.

[23] *Id*. at 01:22-01:37.

[24] Tricia McLaughlin (@TriciaOhio), X (Jan. 7, 2026, at 12:41 PM ET), https://perma.cc/RMV3-BUFV.

[25] Zoe Sottile, Alisha Embrahimji & Karina Tsui, *911 Transcripts, Incident Reports and Videos Show How an ICE Agent Shot a Mother of 3 at 'Point Blank Range'*, CNN (Jan. 17, 2026), https://www.cnn.com/2026/01/17/us/ice-shooting-minneapolis-renee-good.

[26] Nina Moini & Ellen Finn, *How ICE Uses Phone and Internet Data to Identify and Track People*, MPR News (Jan. 12, 2026), https://www.mprnews.org/episode/2026/01/12/how-ice-uses-phone-and-internet-data-to-identify-and-track-people; Joseph Menn, *ICE and Activists Clash over Doxing and Privacy, in Court and Streets*, Wash. Post (Jan. 15, 2026), https://www.washingtonpost.com/technology/2026/01/15/ice-activists-doxing; CNN, *How ICE Agents Are Using Cellphone Cameras in the Field*, (CNN Jan. 21, 2026), https://www.cnn.com/2026/01/21/politics/video/ice-agents-are-using-cellphone-cameras-in-the-field-invs.

[27] Fox News, *Homan Pushes to Create 'Database' to Make Those Who Impede ICE 'Famous'*, at 03:29-04:29 (Fox News, Jan. 15, 2026), https://www.foxnews.com/video/6387789141112.

"images, license plates, identifications, and general information on hotels, agitators, protestors, etc." provided further confirmation.[28]

30.    Meanwhile, DHS continued expanding operations, this time to Maine, with "Operation Catch of the Day."[29]

31.    Soon after, on January 24, 2026, DHS agents shot and killed another Minnesotan protester, Alex Pretti. ICE agents had broken Mr. Pretti's ribs in another encounter a week prior to his death.[30] A source told the media that Mr. Pretti was "known" to federal agents after that point.[31]

32.    DHS Secretary Noem asserted that Mr. Pretti had engaged in "domestic terrorism," coming to the scene to "inflict maximum damage" and to "kill law enforcement."[32] She asserted that he "attacked" DHS agents and they "took action to defend their lives."[33] But once again, video evidence contradicted these claims, showing that DHS agents had already disarmed and restrained Mr. Pretti when they fired ten or more shots into his back.[34]

33.    Protesters in Maine soon reported experiencing the same intimidation as protesters in Minnesota. In one sworn statement, a protester reported that DHS agents recorded

---

[28] Jeff Winter & Priscilla Alvarez, *Alex Pretti Broke Rib in Confrontation with Federal Agents a Week Before Death, Sources Say*, CNN (Jan. 27, 2026), https://www.cnn.com/2026/01/27/us/alex-pretti-protesters-minneapolis-invs.

[29] Press Release, DHS, *ICE Launches "Operation Catch of the Day" Targeting the Worst of Worst Criminal Illegal Aliens Across Maine* (Jan. 21, 2026), https://perma.cc/UR99-JJXP.

[30] Winter & Alvarez, *supra* n.28.

[31] *Id.*

[32] USA Today, *Kristi Noem Press Conference on Alex Pretti Shooting Claims Minneapolis Man was a 'Terrorist'*, at 01:34-02:14, 16:58-17:18 (YouTube, Jan. 24, 2026), https://youtu.be/Amhb8PK_an8?si=7D2bIhSSWIZqhvxO.

[33] *Id.* at 20:35-20:49.

[34] Devon Lum & Haley Willis, *Videos Show Moments in Which Agents Killed a Man in Minneapolis*, N.Y. Times (Jan. 27, 2026), https://www.nytimes.com/2026/01/24/us/minneapolis-shooting-federal-agents-video.html.

her face and car and told her that if she kept observing DHS activities, she would be added to "a domestic terrorist watchlist."[35] In another sworn statement, a second protester similarly reported that DHS agents recorded her face and car.[36] When she asked why, an agent replied "Cause we have a nice little database and now you're considered a domestic terrorist, so have fun with that."[37]

34.    DHS Secretary Noem denied the existence of such a database,[38] but the agency's efforts to acquire numerous new surveillance tools[39] and vast quantities of data,[40] some specifically about people who have publicly criticized DHS,[41] undermine her words.

35.    In order to ascertain what information DHS agents are collecting about protesters

---

[35] Decl. of Elinor Hilton in Supp. of Pls.' Mot. for a TRO at ¶¶ 10, 21-23, *Hilton v. Noem*, No. 2:26-cv-00092-JAW (D. Me. Feb. 23, 2026).

[36] Decl. of Colleen Fagan in Supp. of Pls.' Mot. for a TRO at ¶¶ 13-16, *Hilton v. Noem*, No. 2:26-cv-00092-JAW (D. Me. Feb. 23, 2026).

[37] *Id.* at ¶ 17.

[38] Forbes Breaking News, *'Are You Creating A Database Of American Citizens?': Correa Grills Noem Over Alleged DHS Database*, at 00:33 (YouTube, Mar. 7, 2026), https://youtu.be/J0WNew5uu8o?si=QrD-NlRbgwoEvz3Q&t=33.

[39] Eva Dou, Artur Galocha & Kevin Schaul, *The Powerful Tools in ICE's Arsenal to Track Suspects — and Protesters*, Wash. Post (Jan. 29, 2026), https://www.washingtonpost.com/technology/interactive/2026/ice-surveillance-immigrants-protesters/.

[40] Kimberly Kindy & Amanda Seitz, *Trump Administration Hands over Medicaid Recipients' Personal Data, Including Addresses, to ICE*, AP News (July 17, 2025), https://perma.cc/UJ7F-5A67; Rene Marsh, *IRS Begins Sharing Sensitive Taxpayer Data with Immigration Authorities to Find Undocumented Migrants*, CNN (Aug. 8, 2025), https://www.cnn.com/2025/08/08/politics/irs-dhs-share-taxpayer-data-undocumented-immigrants; Vittoria Elliott, *Social Security Data Is Openly Being Shared With DHS to Target Immigrants*, Wired (Nov. 18, 2025), https://www.wired.com/story/social-security-data-shared-with-dhs-target-immigrants/; Billal Rahman, *ICE Buying Americans' Location Data Under Scrutiny*, Newsweek (Mar. 5, 2026), https://www.newsweek.com/ice-buying-americans-location-data-under-scrutiny-11627381.

[41] Sheera Frenkel & Mike Isaac, *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts*, N.Y. Times (Feb. 13, 2026), https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html.

and whether they are in fact using it to track and intimidate protesters, CREW sent FOIA

requests to DHS, USCIS, CBP, and ICE on February 13, 2026. *See* Ex. 1.

36. CREW submitted the requests to DHS, ICE, and CBP through DHS's

SecureRelease portal, and to USCIS through its FOIA Immigration Records System (FIRST).

*See* Exs. 2, 3.

37. The letters requested the following records from January 20, 2025 to the date the

request was processed:

a. A copy of the DHS memorandum reportedly sent to DHS agents temporarily assigned to Minneapolis that asked them to "capture all images, license plates, identifications, and general information on hotels, agitators, protestors, etc," and any communications referencing this memorandum;

b. A copy of any other DHS memorandum sent to DHS agents assigned to Minneapolis that required or requested that they gather images or information relating to the identification, license plates, or other information of protesters, observers, agitators, any other person perceived to be inhibiting or interfering with DHS operations, or hotels in the area, and any communications referencing this memorandum;

c. A copy of the form titled "intel collection non-arrests"referenced in DHS guidance to DHS agents in Minneapolis in January 2026, including any associated instructions or guidance;

d. A copy of any form issued to DHS agents assigned to Minneapolis regarding or to facilitate the collection of intelligence about any person other than those wanted or arrested for violating federal immigration laws;

e. Any and all records relating to any DHS database of "domestic terrorists;"

f. The following records concerning the creation, development, implementation, or operation of any database, list, or system of records, tracking, monitoring, or storing information about individuals who observe, record, protest, "agitate" during, or otherwise inhibit or interfere with immigration enforcement operations:

   i. Records sufficient to show the name and locations of such systems, relevant search terms may include: Paragon, Penlink tools, Palantir, Clearview AI, or Mobile Fortify;

ii.    Records sufficient to show the categories of information being collected in such systems;

iii.   Any completed Privacy Threshold Analysis (PTA), Privacy Impact Assessment (PIA), Privacy Compliance Review (PCR), SORN determination, for such systems, or communications referencing them;

iv.    Any communication to the Office of Management and Budget, as required by OMB Circular A-108, or the House Oversight Committee and Senate Homeland Security Committees;

v.     All communications regarding the legal requirements for collecting, storing, using, and sharing such information in such systems;

vi.    Records sufficient to show which DHS offices, components, or external agencies have access to the information in these systems;

vii.   Records sufficient to show the number of individuals whose personal information have been collected, compiled, or stored in such systems;

viii.  Records sufficient to show how many times immigration agents have accessed, queried, or retrieved information from any such database or system, including audit logs, access logs, or usage statistics;

ix.    All standard operating procedures, field guidance, or operational directives instructing agents on how to use information contained in any database of protesters or observers in planning or executing immigration enforcement operations.

38.    CREW's requests sought a fee waiver. Ex. 1 at 3-4.

39.    DHS's SecureRelease portal automatically assigns a tracking number to each request upon submission. The portal assigned CREW's DHS request tracking number 2026-HQFO-01851, ICE request tracking number 2026-ICFO-17069, and CPB request tracking number CBP-FO-2026-061468. Ex. 2.

40.    USCIS's FIRST system assigned CREW's USCIS request control number COW2026002190. Ex. 3.

41.    DHS, USCIS, and ICE have not responded to CREW since the FOIA request was submitted to each agency through their respective online portals, nor provided any substantive

update through their portals. Both portals indicated only that the requests are "received" or "pending." Exs. 2, 3.

42.    On February 25, 2026, CBP acknowledged receipt of CREW's FOIA request by email and assigned it the tracking number CBP-FO-2026-061468. *See* Ex. 4.

43.    In the email, CBP invoked 6 C.F.R. § 5.5(c), stating that it was entitled to the ten-day extension permitted for "unusual circumstances" because CREW's FOIA request was "of substantial interest to two or more components of CBP" and required CBP to "consult with those entities." Ex. 4.

44.    On an unknown date, CBP updated the status of CREW's expedited processing request to "declined" and the status of CREW's FOIA request to "searching for records" in the SecureRelease portal. *See* Ex. 2.

45.    To date, CREW has not received a determination on its request for expedited processing from DHS, USCIS, or ICE.

46.    DHS, USCIS, CBP, and ICE have not produced any documents or otherwise responded to CREW's FOIA requests.

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of FOIA - Wrongful Denial of Expedited Processing
### (5 U.S.C. § 552; 6 C.F.R. § 5.5)

47.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

48.    On February 13, 2026, CREW properly submitted expedited processing requests and FOIA requests seeking records within the possession, control, and custody of DHS, USCIS, CBP, and ICE.

49.    CREW properly sought expedition because CREW is primarily engaged in disseminating information and the requests involved both an urgency to inform the public about an actual or alleged federal government activity.

50.    CREW properly sought expedition because the requests involved a matter of widespread and exceptional media interest that raised questions about the government's integrity and affected public confidence.

51.    Defendant wrongfully denied CREW's requests for expedited processing, including by failing to respond to CREW's expedited processing requests within 10 days and failing to process CREW's requests on an expedited basis.

52.    CREW has constructively exhausted its administrative remedies.

53.    By denying CREW's requests for expedited processing and failing to timely release all requested non-exempt records in full to CREW, Defendant is in violation of FOIA and its implementing regulations.

54.    Accordingly, CREW is entitled to injunctive and declaratory relief with respect to expedited processing of its February 13, 2026 FOIA requests.

**COUNT TWO**
**Violation of FOIA - Wrongful Withholding of Records**
**(5 U.S.C. § 552)**

55.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

56.    In its February 13, 2026 requests, CREW properly asked for records within the possession, custody, and control of DHS, USCIS, CBP, and ICE.

57.    Defendant wrongfully withheld agency records requested by CREW by failing to make determinations on CREW's requests within the statutorily prescribed time period of 20

business days, as required by 5 U.S.C. § 552(a)(6)(A), and by continuing to withhold documents that are non-exempt and responsive to CREW's FOIA requests.

58.    DHS and its components have failed to conduct an adequate search in response to CREW's FOIA requests.

59.    By failing to timely release all requested records in full to CREW, Defendant is in violation of FOIA.

60.    CREW has constructively exhausted its administrative remedies.

61.    Accordingly, CREW is entitled to injunctive and declaratory relief requiring Defendant to immediately process and disclose all non-exempt requested records to CREW.

**REQUESTED RELIEF**

WHEREFORE, CREW respectfully requests that this Court:

(1) Declare that Plaintiff is entitled to expedited processing and disclosure of the non-exempt records it has requested in its FOIA requests;

(2) Order Defendant to expeditiously and fully process Plaintiff's FOIA requests and disclose all non-exempt records and a Vaughn index to Plaintiff;

(3) Order Defendant to preserve all records, in whatever form they exist, potentially responsive to all of CREW's pending FOIA requests prior to and during the processing of these requests;

(4) Order Defendant to grant CREW's requests for fee waivers;

(5) Provide for expeditious proceedings in this action;

(6) Retain jurisdiction of this action to ensure no agency records are wrongfully withheld;

(7) Award CREW its costs and reasonable attorneys' fees in this action; and

(8) Grant such other relief as the Court may deem just and proper.

Date: March 23, 2026                        Respectfully Submitted,

                                          <u>s/ Kayvan Farchadi</u>
                                          Kayvan Farchadi (D.C. Bar No. 1672753)
Lauren C. Bingham (D.C. Bar No. 90043462)*
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
kfarchadi@citizensforethics.org
lbingham@citizensforethics.org

*Pro Hac Vice* Motion Forthcoming

*Counsel for Plaintiff*

16